863 A.2d 536

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Russell COX, Appellant.**

Supreme Court of Pennsylvania.

Submitted Nov. 6, 2003.

Decided Dec. 22, 2004.

110

David Scott Rudenstein, Philadelphia, for Russell Cox.

Hugh J. Burns, Philadelphia, Amy Zapp, Harrisburg, Lorie K. Dakessian, for Com. of PA.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice NEWMAN.

Russell Cox (Appellant) appeals from the Order of the Court of Common Pleas of Philadelphia County (PCRA court) dismissing his Petition for Post–Conviction Relief pursuant to the Post–Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. For the reasons set forth herein, we affirm the Order of the PCRA court.

## *FACTS AND PROCEDURAL HISTORY*

On February 26, 1986, at approximately 7:00 p.m., Appellant accompanied Percy Lee (Lee) to the North Philadelphia apartment of Evelyn Brown, where Lee resided prior to being evicted. For approximately one year preceding this date, Lee, a former family friend, lived with Evelyn Brown, and her four children, in the apartment.

When Appellant and Lee arrived at the front door of the Browns' apartment, Lee knocked on the door and asked to use the telephone. Sonya Brown, the eldest daughter of Evelyn Brown, recognized Lee and, based upon specific instructions from her mother, refused to allow him to enter. As a result, Lee became enraged and angrily kicked the door repeatedly for several minutes. Before leaving, Lee wrote in black marker across the apartment door: "All you bitches, hit man Butter." (Notes of Testimony (N.T.), April 27, 1987, page 497).

Early the next morning, on February 27, 1986, Appellant and Lee returned to the Browns' apartment. A neighbor of the Browns, Denise Williams (Williams), testified that she saw Appellant and Lee standing outside of the Browns' apartment door shortly before 2:00 a.m. Williams testified that she watched as Appellant conversed with someone inside the apartment. Meanwhile, she also noticed Lee standing with his back pressed against the adjacent wall to avoid being detected through the peephole. Williams further testified that she could hear Appellant conversing with one of the female occupants of the apartment, whom he eventually persuaded into opening the front door. When the door opened, both Appellant and Lee entered the apartment, which at the time was occupied by Evelyn Brown, along with her seventeen-year-old daughter Tina Brown and five-year-old son Daniel Brown.

After entering the Browns' apartment, Appellant and Lee were not spotted again until approximately 3:30 a.m., when they unexpectedly appeared at the apartment of Samuel Gilbert (Gilbert). Gilbert, who lived in the same apartment building as the Browns, was a family friend of Lee, with whom Lee had occasionally lived following his eviction from the Browns' apartment. Lee awakened Gilbert and explained to him that he "did something bad." (N.T., May 1, 1987, page 1075). After Gilbert inquired further, Lee admitted that he stabbed Evelyn Brown. At this point, Lee gathered up a few articles of clothing from Gilbert's apartment and informed Gilbert that both he and Appellant were leaving to stay at his mother's house.

Later that same morning, Sonya Brown returned home from an overnight babysitting job to find her mother and younger sister brutally murdered.[1] The police were immediately notified and arrived at the Browns' apartment at approximately 8:40 a.m. In the rear bedroom of the apartment, the police discovered Evelyn Brown in a kneeling position with her back against her bed. Her hands and feet had been hogtied behind her back and a pair of panties was stuffed inside her mouth. She had been stabbed with a knife and scissors a total of forty-eight times in the face, neck, chest, side, and thigh. The deep puncture wounds from the weapons caused blood to spatter as much as four feet from her corpse. Next to her body, the killers left behind two playing cards, an ace and a jack, face-up on a pillow.

In a nearby bedroom, the police also discovered the blood-soaked body of Tina Brown. Tina's hands had been tied behind her back with a shoelace and a cloth noose had been positioned around her neck. Her pants had been removed and she had been raped prior to being stabbed an aggregate of fifty-three times in the face, head, neck, chest, abdomen, buttocks, and thigh. Similar to the gashes suffered by her mother, Tina's deep puncture wounds had been inflicted by a knife and scissors.

Later that same day, Gilbert informed the investigating homicide detectives of his early-morning encounter with Lee, in which Lee admitted to stabbing Evelyn Brown. Based on this information, the police immediately obtained an arrest warrant for Lee. The police also executed a search warrant for the home of Lee's mother, seizing two knives and a pair of scissors consistent with the types of weapons used to inflict the deep puncture wounds on both victims.

A few days later, on March 2, 1986, Appellant voluntarily appeared at the police station to provide information about the incident. At this time, Appellant was not a suspect in the

---

1. The assailants did not physically harm Sonya Brown's brother, Daniel Brown, during the gruesome slayings of Evelyn and Tina Brown. However, the resultant emotional trauma from witnessing the murders prohibited Daniel Brown from testifying at Appellant's subsequent trial.

ongoing investigation; however, the homicide detectives informed Appellant of his *Miranda*[2] rights, which he voluntarily waived. Appellant admitted to the detectives that he was present outside of the Browns' apartment earlier in the day when Lee knocked on the door. Appellant, however, denied any involvement in the murders. Instead, Appellant explained that Lee merely showed him the two blood-soaked bodies and, thereafter, admitted killing the victims. After providing this information, Appellant arranged to return at a later date for a polygraph examination.

On March 4, 1986, Appellant returned to the police station to take a polygraph examination. The homicide detectives yet again informed Appellant of his *Miranda* rights, which he voluntarily waived. Before submitting to the polygraph examination, Appellant notified the detectives that he wished to discuss the murders instead of taking the polygraph. Appellant then proceeded to confess to the detectives that he raped Tina Brown. At this point, the detectives stopped Appellant and once again informed him of his *Miranda* rights, which he again voluntarily waived. Thereafter, the police placed Appellant under arrest.

Once under arrest, Appellant fully confessed that he raped Tina Brown. Appellant also admitted that he was present during both murders. However, Appellant denied any involvement in the murders and claimed that Lee acted alone in killing both victims. In his statement to the police, Appellant admitted, *inter alia*, that he: (a) accompanied Lee to the Browns' apartment earlier in the night; (b) returned to the apartment later that night and someone let him into the apartment after conversing through the front door; (c) helped bind one of the victims with a shoelace; (d) had sex with Tina Brown after Lee bound and gagged her; (e) watched as Lee stabbed both victims numerous times with a knife and scissors; (f) accompanied Lee to Gilbert's apartment afterward; and (g) accompanied Lee to his mother's house where Lee cleaned the murder weapons.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

From April 9, 1987 until May 20, 1987, Appellant was tried jointly with co-defendant Lee. On May 20, 1987, the jury found Appellant guilty of two counts of first-degree murder,[3] criminal conspiracy,[4] rape,[5] and possessing an instrument of crime (PIC).[6] On May 22, 1987, following a two-day penalty hearing, the jury sentenced Appellant to death for both murder convictions. In reaching its sentence of death, the jury found three aggravating circumstances and three mitigating circumstances. The three aggravating circumstances presented by the Commonwealth and found by the jury included: (1) Appellant committed the murders while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); (2) Appellant committed the offenses by means of torture, 42 Pa.C.S. § 9711(d)(8); and (3) Appellant had been convicted of another offense for which a sentence of life imprisonment could be imposed, 42 Pa.C.S. § 9711(d)(10). The three mitigating circumstances advanced by Appellant and found by the jury included: (1) Appellant had no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1); (2) the age of Appellant at the time of the crime, 42 Pa.C.S. § 9711(e)(4); and (3) any other evidence of mitigation concerning the character and record of Appellant and the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8). After weighing the three aggravating circumstances against the three mitigating circumstances, the jury found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Appellant to death for each murder conviction.

Trial counsel filed Post–Verdict Motions; however, the court appointed new counsel after Appellant claimed that his trial counsel was ineffective. Thereafter, new counsel filed additional Post–Verdict Motions. Following an evidentiary hearing at which trial counsel testified, the trial court denied the Post–Verdict Motions. The court then formally imposed

3. 18 Pa.C.S. § 2502(a).
4. 18 Pa.C.S. § 903.
5. 18 Pa.C.S. § 3121.
6. 18 Pa.C.S. § 907.

consecutive sentences of death for each of the two first-degree murder convictions against Appellant. The court also sentenced Appellant to concurrent terms of: (1) ten to twenty years' imprisonment for rape; (2) five to ten years' imprisonment for criminal conspiracy; and (3) two and one-half to five years' imprisonment for PIC.

Appellant filed a direct appeal to this Court and we affirmed the Judgments of Sentence on December 23, 1996. *Commonwealth v. Cox*, 546 Pa. 515, 686 A.2d 1279 (1996), *cert. denied,* 522 U.S. 999, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997). Thereafter, on December 17, 1997, Appellant filed a *pro se* PCRA Petition. The court appointed counsel, who subsequently filed an Amended PCRA Petition on February 11, 1999. Unfortunately, the trial judge, the Honorable Robert A. Latrone, passed away during the course of the PCRA litigation; accordingly, the PCRA matter was reassigned to the Honorable William Manfredi.

On February 11, 2000, the Commonwealth filed a Motion to Dismiss the Amended PCRA Petition. On June 16, 2000, the court permitted Appellant to file a Supplemental Amended PCRA Petition. In response, on September 27, 2000, the Commonwealth filed a Supplemental Motion to Dismiss. Thereafter, on October 3, 2001, the court permitted Appellant to file a Second Supplemental Amended PCRA Petition. Once again, the Commonwealth responded by renewing its Motion to Dismiss.

After holding argument on the Motion to Dismiss and reviewing the record, the PCRA court issued a notice of intent to dismiss pursuant to Pa.R.Crim.P. 1507.[7] Subsequently, in an Order dated June 18, 2002, the court dismissed the PCRA Petition without a hearing. This timely appeal followed.

7. Rule 1507 has since been renumbered as Rule 907. Rule 907 provides that a PCRA Petition may be denied without a hearing when the court determines "that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings...." Pa.R.Crim.P. 907(1).

### DISCUSSION

On appeal to this Court, Appellant asserts that PCRA relief was improperly denied where: (1) trial counsel was ineffective for failing to contact and retain a psychologist in a prompt manner; (2) trial counsel was ineffective for failing to object to the Commonwealth's introduction of the concept of "truth serum" into the trial; (3) all prior counsel were ineffective for failing to challenge prosecutorial misconduct; (4) all prior counsel were ineffective for failing to challenge the reasonable doubt charge given by the trial court; (5) all prior counsel were ineffective for failing to challenge the jury instruction given by the trial court on accomplice liability; (6) trial counsel was ineffective at the penalty phase when he conveyed to the jury that Appellant could be rehabilitated and released into society; (7) all prior counsel were ineffective for failing to challenge the impermissible judicial comment made by the trial court, which adversely reflected on the lone character witness of Appellant; and (8) all prior counsel were ineffective for failing to challenge the faulty jury instruction given by the trial court, which failed to instruct the jury that mitigating factors could be found by any juror and did not have to be found unanimously.

To raise an ineffective assistance of counsel claim pursuant to the PCRA, a "petitioner must plead and prove by the preponderance of the evidence ... "[t]hat the conviction or sentence resulted from ... [i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). In *Commonwealth v. Pierce,* 567 Pa. 186, 786 A.2d 203, 213 (2001), we explained that, for a PCRA petitioner to be entitled to relief on a claim of ineffectiveness of counsel, the petitioner must establish: (1) that there is merit to the underlying claim; (2) that counsel had no reasonable basis for his or her conduct; and (3) that the petitioner was prejudiced by counsel's performance, i.e. that there is a reasonable probability that, but for the act or omission challenged, the outcome of the proceeding would have been different. *See also Strick-*

*land v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003), this Court recently clarified the procedure to be followed in preserving and proving a PCRA claim challenging the effectiveness of counsel other than immediate appellate counsel. In *McGill,* we explained that "in order for a petitioner to properly raise and prevail on a layered ineffectiveness claim, sufficient to warrant relief if meritorious, he must **plead, present,** and **prove**" the ineffectiveness of direct appellate counsel, which necessarily relates back to the actions of trial counsel. *Id.* at 1022 (emphasis in original). Therefore, to preserve a claim that direct appellate counsel was ineffective, the petitioner must: (1) plead, in his PCRA petition, that direct appellate counsel was ineffective for failing to allege that trial counsel was ineffective; and (2) present argument and develop all three prongs of the *Pierce* test regarding the ineffectiveness of direct appellate counsel. *Id.*

As we explained in *McGill* and expounded in *Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651 (2003), a claim of appellate counsel ineffectiveness is merely a derivative claim related to the ineffectiveness of trial counsel. Therefore, to demonstrate that a "layered" claim of appellate counsel's ineffectiveness has arguable merit, the petitioner must develop all three prongs of the *Pierce* test as to the ineffectiveness of trial counsel. *McGill,* 832 A.2d at 1022; *Rush,* 838 A.2d at 656. If the petitioner fails to develop any of the three *Pierce* prongs regarding the underlying issue of trial counsel ineffectiveness, he or she will have failed to establish an ineffectiveness claim as to appellate counsel. *McGill,* 832 A.2d at 1023; *Rush,* 838 A.2d at 656. Only when the petitioner has adequately pled and presented the ineffectiveness of trial counsel pursuant to the *Pierce* test will this Court proceed to review the layered claim to determine whether he or she has proven appellate counsel's ineffectiveness. *McGill,* 832 A.2d at 1023.

Pursuant to the mandate of *McGill,* where the petitioner has pled, presented, and proved the underlying issue of

trial counsel ineffectiveness, a remand may be necessary to allow the petitioner an opportunity to correct any errors with regard to the pleading and presentation of his or her claim of appellate counsel ineffectiveness. *Id.* at 1024. Where the petitioner fails to plead and prove all three prongs of the *Pierce* test regarding the underlying issue of trial counsel's ineffectiveness, however, a remand is unnecessary for the reason that the petitioner cannot establish the arguable merit prong of the *Pierce* test regarding the ineffectiveness of appellate counsel. *Id.; Rush,* 838 A.2d at 656.

Therefore, as a threshold matter, we must determine whether Appellant has properly preserved his claims as required by *McGill* and *Rush.* As discussed above, this Court requires that a petitioner properly plead and present his or her claims in order to be entitled to review. In the instant matter, Appellant properly pled and presented each layered ineffectiveness claim in a manner sufficient to warrant merits review. In his Brief to this Court, Appellant adequately addressed all three prongs of the *Pierce* test regarding the ineffectiveness of trial counsel and direct appeal counsel. However, as detailed below, Appellant has failed to satisfy all three prongs of the *Pierce* test as it relates to each underlying issue of trial counsel's ineffectiveness. Having failed to establish trial counsel's ineffectiveness for each issue raised on appeal, Appellant cannot satisfy the arguable merit prong of the *Pierce* test regarding the ineffectiveness of appellate counsel. In light of this determination, a remand is not warranted here.

In turning to the issues raised on appeal, Appellant first claims that his trial counsel was ineffective for failing to contact and retain an expert witness, namely, a psychologist, in a timely manner. Appellant contends that he built his entire defense upon the theory that he suffered from mental impairment because of diminished capacity and/or lack of education; therefore, he claims that he could not understand and appreciate his *Miranda* rights. Appellant argues that trial counsel was ineffective for inexplicably hiring defense psychologist, Mark Molyneux (Molyneux), midway through the trial. According to Appellant, trial counsel's erroneous delay

in obtaining a psychologist to testify until mid-trial destroyed the credibility of his expert witness and made Molyneux appear as though he were a "hired gun."

For Appellant's claim to be cognizable pursuant to the PCRA, Appellant must plead and prove that his ineffective assistance of counsel claim has not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue has been deemed previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue[.]" 42 Pa.C.S. § 9544(a)(2).

■ On direct appeal to this Court, Appellant claimed that trial counsel was ineffective for failing to present expert testimony regarding his mental deficiencies at the pretrial suppression hearing. *Cox,* 686 A.2d at 1291. We rejected this claim by stating:

> Where counsel did not know and had no reason to know about a defendant's alleged mental impairment at the time, counsel is not ineffective for failing to exploit it.

> The record reflects that at the time of the suppression hearing, appellant had given counsel no reason to believe that he was mentally impaired or had a reading comprehension problem. Appellant communicated with counsel easily. Counsel reviewed appellant's school records before the suppression hearing and determined that appellant was not in any special classes or curriculum for the learning disabled. It was in preparation for trial that counsel first suspected that appellant might have a reading problem. At trial, counsel presented a school psychologist, Mark Molyneux, to support his claim that appellant was unable to understand his *Miranda* rights or read and formulate his confession.

> Appellant claims that his mental impairment could have been discovered before the suppression hearing if counsel had conducted a more thorough pre-suppression hearing investigation. This claim is contradicted by counsel's testimony at the post-verdict hearing respecting the extent of his preparation. Further, appellant has failed to demonstrate what counsel should have done or that the outcome at

the suppression hearing would have been different. Appellant's claim has no merit.

*Id.* at 1291–92. As the abovementioned illustrates, the timeliness of trial counsel to retain a psychologist was previously litigated on direct appeal. Appellant now attempts to present a new theory of relief to support this previously litigated claim by framing the issue as whether trial counsel, in failing to retain a psychologist, inadequately prepared for **trial** in a timely manner. However, it is well settled that a PCRA petitioner cannot obtain review of a previously litigated claim by presenting a new theory of relief to relitigate the previously litigated claim. *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 939 n. 2 (2001); *Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890, 896 (1999), *habeas corpus granted in part sub nom. Porter v. Horn*, 276 F.Supp.2d 278 (E.D.Pa.2003). Therefore, Appellant's new theory of relief will not revive this issue.

■ Appellant's second claim is that trial counsel was ineffective for failing to object when the prosecutor cross-examined Molyneux about Sodium Amitol, commonly known as "truth serum." Appellant argues that the prosecutor improperly questioned the credibility of Molyneux's expert testimony by referencing his failure to administer truth serum when examining Appellant. During the cross-examination of Molyneux, the following exchange occurred between the prosecutor and Molyneux:

Q. How intelligent is he when it comes to doing things that don't require reading?

A. Not very, Sir. We already placed him at the second percentile on an intelligence test that was validly administered.

Q. Do you know what Sodium Amitol is?

A. It's a drug.

Q. What's it used for in the psychological field, psychiatric field, do you know?

A. I'm not a psychiatrist, but is that not a truth serum?

Q. Yes. Sometimes you give it to people to see if, in fact, they're not telling you, the evaluator, the truth, right?

A. This is true.

Q. Now, none of these questions you asked this man are you able to sit here and tell us that you acknowledge that he wasn't fooling you, do you?

A. I have only my clinical sense that the instruments were validly administered.

(N.T., May 5, 1987, pages 1567–68). Appellant maintains that there was no strategic reason for trial counsel to have failed to object when the prosecutor inquired into why Molyneux did not use truth serum to determine if Appellant was telling him the truth. Moreover, Appellant claims that he was prejudiced by the failure of trial counsel to object because this alleged improper questioning undermined the credibility of Molyneux, whom Appellant contends was called to testify in order to establish that his statements to the police, which placed him inside the Browns' apartment during the murders, were involuntary.

In rejecting the claim of Appellant, the PCRA court noted that Appellant "failed to carry his burden of demonstrating that he suffered any prejudice from this minor, fairly innocuous exchange." PCRA Court Memorandum Opinion, June 18, 2002, at 6. We agree.

■■ "Absent a demonstration of prejudice, Appellant cannot prevail on a claim for ineffective assistance of counsel and no further inquiry into the claim is warranted." *Pierce*, 786 A.2d at 221. "Prejudice in the context of ineffective assistance of counsel means demonstrating that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different." *Id.* at 213.

In the case *sub judice*, Appellant insists that he suffered prejudice because the testimony of Molyneux was rendered meaningless by the improper questioning of the prosecutor. However, this unsubstantiated claim does not demonstrate that there is a reasonable probability that, but for counsel's alleged error, the verdict would have been different. *See*

*Pierce*, 786 A.2d at 221–22 (explaining that failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim). As noted by the PCRA court, this was a "minor, fairly innocuous exchange." PCRA Court Memorandum Opinion, June 18, 2002, at 6. The prosecutor did not ask Molyneux if he ever administered truth serum while examining Appellant. Moreover, the prosecutor never asked Molyneux what difference it would make if truth serum was or was not administered. As such, this mere mentioning of truth serum proved to be an isolated instance, as it was never mentioned again throughout the course of the trial.

Accordingly, Appellant has failed to carry his burden of demonstrating that he suffered prejudice from the exchange between the prosecutor and Molyneux. Because Appellant has failed to demonstrate that trial counsel was ineffective for failing to object to the inquiry, the claim of Appellant that appellate counsel was ineffective for failing to raise a claim that has no merit on direct appeal necessarily fails. *See McGill*, 832 A.2d at 1022.

■ Appellant's third claim is that all prior counsel were ineffective for failing to object to alleged prosecutorial misconduct. Appellant argues that, during closing argument, the prosecutor made impermissible statements relating to the testimony of Appellant and Molyneux. First, Appellant contends that the prosecutor improperly referred to Appellant as "a liar" on numerous occasions. Relying on the decision of this Court in *Commonwealth v. Ragan*, 538 Pa. 2, 645 A.2d 811 (1994), Appellant maintains that irrefutable evidence did not exist for the prosecutor to broadly characterize Appellant as "a liar." Second, Appellant contends that the prosecutor improperly argued that Molyneux was not thoroughly versed in his profession, and instead engaged in "hocus pocus" and "mumbo jumbo," which was clearly contrary to the record. Consequently, Appellant avers that trial counsel was ineffective for failing to object to the statements of the prosecutor and, accordingly, appellate counsel was ineffective for failing to raise the alleged misconduct on direct appeal.

In *Ragan*, we explained that a prosecutor cannot intrude upon the exclusive function of the jury to evaluate the credibility of witnesses by broadly characterizing the testimony of a witness as a "big lie." *Ragan*, 645 A.2d at 829 (citing *Commonwealth v. Kuebler*, 484 Pa. 358, 399 A.2d 116, 118 (1979)). We also noted in *Ragan*, however, that "a prosecutor's assertion that a witness had lied does not warrant a new trial when the statement was a fair inference from irrefutable evidence rather than a broad characterization." *Id.* (citing *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365, 369 (1984)).

 It is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments is to prejudice the jury, forming in their minds fixed bias and hostility towards the accused that would prevent them from properly weighing the evidence and rendering a true verdict. *Commonwealth v. Gorby*, 527 Pa. 98, 588 A.2d 902, 909 (1991). Similar to the defense, the prosecution is accorded reasonable latitude and may employ oratorical flair in arguing its version of the case to the jury. *Commonwealth v. Williams*, 541 Pa. 85, 660 A.2d 1316, 1322 (1995), *cert. denied*, 516 U.S. 1051, 116 S.Ct. 717, 133 L.Ed.2d 671 (1996). Prosecutorial misconduct will not be found where the comments were based on the evidence or derived from proper inferences. *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1377 (1991), *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991). Finally, any allegedly improper prosecutorial comments must be examined within the context of the conduct of defense counsel. *Commonwealth v. Clayton*, 516 Pa. 263, 532 A.2d 385, 396 (1987), *cert. denied*, 485 U.S. 929, 108 S.Ct. 1098, 99 L.Ed.2d 261 (1988).

As support for his argument, Appellant notes the remark of the prosecutor during his closing argument in which he stated: "Well, I suggest to you that he didn't tell you what he knew, and he told you three different stories about what he knew and he lied in each one of them." (N.T., May 15, 1987, page 1957). Further, Appellant points to another comment made by the prosecutor during his closing argument in which he

asserted: "Let's look at his other statement, the next one he gives, the next scenario of lies he tells." (N.T., May 15, 1987, page 1971).

In rejecting the argument of Appellant, the PCRA court explained that the statements of the prosecutor "were fair comments on the evidence and did not unreasonably inflame or incite the passions of the jury." PCRA Court Memorandum Opinion, June 18, 2002, at 8. We agree.

In the case *sub judice*, the various statements Appellant provided to the police contained numerous discrepancies. Appellant claims that any alleged discrepancies in his statements were the product of his mental deficiency, to which Molyneux attested. The prosecutor, however, countered this claim by attributing the discrepancies in the statements to the dishonesty of Appellant and the lack of qualification of Molyneux. More specifically, the prosecutor attributed the discrepancies to a pattern of lying on the part of Appellant. Further, the prosecutor attempted to question the credibility of Molyneux by challenging his training, educational background, and experience. In this regard, the comments of the prosecutor were not "broad characterizations," but were proper remarks in order to counter the claim of Appellant that he was too mentally deficient to provide consistent statements to the police. *See Ragan*, 645 A.2d at 829; *Chester*, 587 A.2d at 1377. Such reasonable comments by the prosecutor did not prejudice the jury or form in their minds bias and hostility towards Appellant that would have prevented them from properly weighing the evidence. *See Gorby*, 588 A.2d at 909.

In addition, Appellant has failed to demonstrate that he was prejudiced by the failure of trial counsel to object to the comments of the prosecutor. Appellant has not shown that there is a reasonable probability that, but for counsel's alleged error, his verdict would have been different. *See Pierce*, 786 A.2d at 221–22. Therefore, Appellant has failed to establish that trial counsel was ineffective for failing to object to the comments of the prosecutor, and, accordingly, we will not deem appellate counsel ineffective for failing to raise a claim with no merit on direct appeal. *See McGill*, 832 A.2d at 1022.

 Appellant alleges in his fourth claim that all prior counsel were ineffective for failing to object to the "reasonable doubt" charge of the trial court. The "reasonable doubt" instruction provided by the trial court reads in relevant part:

> If you as a juror cannot find matter in or from the evidence on which to base the doubt, then it's not a doubt arising from the evidence and not a reasonable doubt, but simply a possible doubt, and consequently, not such a doubt as would justify a conscientious juror from hesitating to render a verdict with a mind that's fairly satisfied except for the existence of such a doubt of that nature.

(N.T., May 18, 1987, page 2031). Appellant contends that this instruction improperly shifted the burden of proving reasonable doubt to the defense. Appellant also maintains that this instruction effectively removed the possibility that a reasonable doubt could arise from a lack of evidence.[8]

 "When reviewing a challenge to a jury instruction, we must review the charge as a whole." *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1290 (2000), *cert. denied*, 534 U.S. 1104, 122 S.Ct. 902, 151 L.Ed.2d 871 (2002). *See also Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181, 1196 (1996). "An instruction will be upheld if it clearly, adequately and accurately reflects the law. The trial court may use its own form of expression to explain difficult legal concepts to the jury, as long as the trial court's instruction accurately conveys the law." *Spotz*, 759 A.2d at 1287. A trial court has broad discretion in phrasing its instructions and is permitted to choose its own wording. *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 511 (1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998).

---

8. In support of his argument, Appellant cites to the unpublished decision of the United States District Court for the Eastern District of Pennsylvania in *Thompson v. Kelchner*, 00–3466 (E.D.Pa.2001), which found the same jury instruction given by the trial court in this case defective and granted Thompson *habeas* relief. However, on May 8, 2002, the United States Court of Appeals for the Third Circuit reversed the decision of the District Court and approved the reasonable doubt instruction. *Thompson v. Kelchner*, 46 Fed.Appx. 75 (3d Cir.2002) (unpublished memorandum).

In arguing this issue to the Court, Appellant merely extracted and highlighted one isolated paragraph from the twenty-paragraph instruction given by the trial court regarding reasonable doubt. The trial court specifically noted in its lengthy instruction that:

> [The] Commonwealth's burden of proving the defendant's guilt beyond a reasonable doubt never shifts. It remains upon the Commonwealth throughout the entire trial of the case and until such time as the jury, after deliberation, and after a consideration of all of the evidence, the arguments of counsel, and the charge and instructions of this Court concludes that the defendant is guilty of the crimes charged beyond a reasonable doubt.

(N.T., May 18, 1987, pages 2026–27). In addition, the reasonable doubt charge also included the following paragraph:

> But it is doubt which is reasonable, an honest and sincere reasonable doubt, fairly arising from the evidence that was presented or out of the absence or lack of evidence presented with respect to some element of the crime.

*Id.* at 2029. When the instruction on reasonable doubt is properly read in its entirety, the twenty-paragraph charge did not shift the burden of proof to Appellant. Rather, the trial court expressly stated that the "Commonwealth's burden of proving the defendant's guilt beyond a reasonable doubt never shifts." *Id.* at 2026. Furthermore, the charge did not remove the possibility that a reasonable doubt could arise from a lack of evidence. Instead, the instruction specifically explained that a reasonable doubt could arise "out of the absence or lack of evidence presented." *Id.* at 2029.

Despite the argument of Appellant, the instruction of the trial court regarding reasonable doubt, when read in its entirety, was proper. *See Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592, 604 (2000) (explaining that this Court will not review a jury charge by taking isolated comments out of context). Accordingly, trial counsel was not ineffective for failing to object to a proper jury instruction.

Moreover, Appellant has failed to demonstrate that he was prejudiced by the failure of trial counsel to object to the jury instruction regarding reasonable doubt. Appellant has not shown that there is a reasonable probability that, but for counsel's alleged error, his verdict would have been different. *See Pierce*, 786 A.2d at 221–22. Consequently, trial counsel was not ineffective for failing to object to the jury instruction and appellate counsel was not ineffective for failing to raise a claim with no merit on direct appeal. *See McGill*, 832 A.2d at 1022.

Appellant's fifth claim is that all prior counsel were ineffective for failing to object to the jury instruction regarding accomplice liability. Appellant argues that the instruction of the trial court on accomplice liability confused the jury. In addition, Appellant asserts that the charge did not adequately inform the jury that an accomplice must also share the specific intent to kill with the active partner in order to be convicted of first-degree murder. Thus, Appellant argues that the incomplete instruction of the trial court permitted the jury to find him guilty of first-degree murder without having found a shared, specific intent to kill with his co-defendant.

To support his position that the jury instruction did not refer to the concept of shared criminal intent for accomplice liability, Appellant quotes the following portion of the charge:

Thus, in order to find the defendant guilty of murder in the first degree, you must first find that the defendant caused the death of another person, or that an accomplice caused the death of another person. That is, you must find that the death of the victims in this case, Tina Brown and Evelyn Heath Brown, would not have occurred but for the defendant's acts, or the acts of the defendants' or acts of the defendant's accomplice, and, thereafter you must determine if the killing was intentional.

(N.T., May 19, 1987, page 2145). As in his previous issue, however, Appellant fails to read the jury instruction in its totality. *See Spotz*, 759 A.2d at 1290. When instructing the jury on accomplice liability, the trial court explained:

As stated, a defendant is guilty of a crime if he is an accomplice of another person who commits that crime. He's an accomplice if, with the intent of promoting or facilitating the commission of the crime, he solicits, commands, encourages or requests the other person to commit, or aids, agrees to aid, or attempts to aid the other person in planning or committing it.

\* \* \* \*

Please bear in mind mere physical presence of a person at a crime scene without proof of any additional type of conduct does not make him an accomplice.

Rather, the facts and circumstances must be closely examined in order to establish that the defendant, through his words, acts, deeds, or conduct, make him a partner in the criminal intent and encourages or assists him or engages in comparable overt behavior.

For a person to be an accomplice in the commission of a crime, he must be a direct active partner in the intent to commit it. That is, he must have prior knowledge of the criminal intent or criminal purpose of his accomplice and then counsel or participate in such purpose.

(N.T., May 18, 1987, pages 2108–09). Regarding the charge for murder in the first degree, the trial court also instructed the jury:

Therefore, in order to find the defendant guilty of murder of the first degree, you must find that the killing was a willful, deliberate and premeditated act.

You must ask yourselves the question did the defendant have the willful, deliberate, and premeditated specific intent to kill at the time of the killing.

(N.T., May 19, 1987, page 2146). The aforementioned instructions, when reviewed in totality, clearly and accurately indicated to the jury that, to find Appellant guilty of murder in the first degree, it was necessary that they find he possessed the requisite specific intent to kill. *See Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 876 (2000), *cert. denied*, 535

U.S. 1102, 122 S.Ct. 2306, 152 L.Ed.2d 1061 (2002) (explaining that no relief is due where the trial court charge fully informed the jury of the mental state required to find appellant guilty of first-degree murder as an accomplice). The charge properly instructed the jury that they had to find that Appellant acted with the specific intent of promoting or facilitating the commission of a willful or deliberate killing. *See Commonwealth v. Simpson*, 562 Pa. 255, 754 A.2d 1264, 1275 (2000), *cert. denied*, 533 U.S. 932, 121 S.Ct. 2556, 150 L.Ed.2d 722 (2001) (noting that an accomplice liability charge against the backdrop of a charge to the jury regarding the requisite mental state for first-degree murder is proper). As such, the instruction was not confusing and adequately informed the jury that an accomplice must also share the specific intent to kill with the active partner to be convicted of first-degree murder. Therefore, trial counsel was not ineffective for failing to object to a proper jury instruction.

Likewise, Appellant has failed to demonstrate that he was prejudiced by the failure of trial counsel to object to the jury instruction regarding accomplice liability. Appellant has not shown that there is a reasonable probability that, but for counsel's alleged error, his verdict of guilty for first-degree murder would have been different. *See Pierce*, 786 A.2d at 221–22. Consequently, trial counsel was not ineffective for failing to object to the jury instruction and appellate counsel was not ineffective for failing to raise a claim without merit on direct appeal. *See McGill*, 832 A.2d at 1022.

 Appellant's sixth claim is that trial counsel was ineffective during his penalty phase closing argument for stating that Appellant could be rehabilitated and possibly released into society. During closing argument, trial counsel declared:

I also want you to add to that his age at the time of the commission of this crime. He was 18–years old, and I want you to take a look at how young the man was, how serious a mistake that you have determined he made, and then determine whether my client should not be given the right at least to rehabilitate himself instead of die.

I mean, we're not talking about a man who is 30–years old and has been through the court system many, many times. We're talking about a boy, 18–years old, who's convicted for the first time in his entire life, and should we take away the opportunity for this boy to rehabilitate himself in order to conform with society norms.

\* \* \* \*

Now, you're to view his age as was it a youth making a mistake, although serious a mistake, a mistake in judgment, a bad mistake. And consider it in that light, I ask you. I think a boy who is 18–years old should be given a chance to rehabilitate himself.

The other alternative you have is life imprisonment. The alternative we're giving him is life imprisonment, two counts, if you return that count of life imprisonment.

Ladies and gentlemen, is that long enough to rehabilitate yourself? I ask you to give my client life imprisonment and not sentence him to die. I think a boy who commits an error as grievous as this should not be sentenced to death, not where his character testified of nonviolence and his prior record indicates that this isn't the nature of the boy.

(N.T., May 22, 1987, pages 2399–2401). Appellant contends that the reference of trial counsel to "rehabilitation" caused the jury to sentence him to death from fear that he would be once again released into society. Thus, Appellant asserts that trial counsel erred by inferring to the jury that Appellant should be afforded the opportunity to rehabilitate himself so that he could someday conform to the norms of society.

In rejecting the claim of Appellant, the PCRA court noted that trial counsel, in making his closing argument to the jury, attempted to show that Appellant was a young man who could be rehabilitated. The PCRA court concluded that "[t]his argument was a perfectly reasonable one and we find no error in trial counsel making every effort to find a basis for the jury to impose life imprisonment, instead of death." PCRA Court Memorandum Opinion, June 18, 2002, at 11. Because trial counsel did not affirmatively contend that Appellant would

someday be returned to general society, we agree with the conclusion of the PCRA court.

While making his closing argument, trial counsel highlighted the young age of Appellant and stressed that he could be rehabilitated while in prison. At no point, however, did trial counsel argue that Appellant should be released from prison and immediately assimilated into society. As such, Appellant has failed to demonstrate that he was prejudiced by the rehabilitation argument raised by trial counsel. Appellant has not shown that there is a reasonable probability that, but for counsel's alleged error, the outcome would have been different. *See Pierce*, 786 A.2d at 221–22. Consequently, trial counsel was not ineffective for making a reasonable argument and appellate counsel was not ineffective for failing to raise a claim without merit on direct appeal. *See McGill*, 832 A.2d at 1022.

■ Appellant's seventh claim is that trial counsel was ineffective for failing to object to the penalty phase jury instruction regarding his character witness. At the guilt phase of the trial, Appellant called Robert Jones (Jones) to testify as to his non-violent character.[9] During its charge to the jury at the penalty phase, the trial court instructed:

Within that mitigating circumstance as to Cox, weigh the evidence of Robert Jones, the witness who testified that he talked to a Mrs. Williams and she said that the defendant was nonviolent, given no qualitative evaluation of what the opinion was, and that he had talked to but one person in the neighborhood.

(N.T., May 22, 1987, page 2441). Appellant argues that the aforementioned charge was an impermissible, judicial comment based on the personal opinions of the trial court.

In dismissing this claim, the PCRA court explained that Appellant offered no basis for concluding that the comment of

9. During the penalty phase, Appellant presented the guilt phase testimony of Robert Jones as support of other evidence of mitigation concerning his character. *See* 42 Pa.C.S. § 9711(e)(8).

the trial court was erroneous. PCRA Court Memorandum Opinion, June 18, 2002, at 12. We agree.

The trial court has a duty to aid the jury in understanding and clarifying the issues to be resolved; however, the charge of the court should be calm and dispassionate. *Commonwealth v. Whiting*, 501 Pa. 465, 462 A.2d 218, 220 (1983); *Commonwealth v. Whitfield*, 474 Pa. 27, 376 A.2d 617, 621 (1977). In order to preserve the right of a defendant to a fair trial, the trial court must remain impartial and refrain from invading the province of the jury. *Whiting*, 462 A.2d at 220. Nevertheless, claims of trial court error cannot be predicated on isolated excerpts of the charge. *Id.; Commonwealth v. Woodward*, 483 Pa. 1, 394 A.2d 508, 510 (1978).

Here, on cross-examination during the guilt phase, Jones provided only the name of Mrs. Williams as support for his contention that he knew others who considered Appellant non-violent. Consequently, the trial court offered the aforementioned clarifying instruction to the jury that Jones only spoke to one person in the neighborhood regarding the reputation of Appellant in the community. In doing so, the trial court was simply elucidating the issues to be resolved and was not invading the province of the jury. *See Whiting*, 462 A.2d at 220. This instruction did not remove the authority of the jury, as the ultimate fact-finder, to weigh the credibility of Jones' testimony. The trial court specifically instructed the jury that they had "to make a factual finding regarding aggravating and mitigating circumstances" if they decided to return a verdict of death. (N.T., May 22, 1987, page 2445). *See Commonwealth v. Marshall*, 537 Pa. 336, 643 A.2d 1070, 1076 (1994) (holding appellant not prejudiced by comments of the trial court where the court provided instructions concerning the duty of the jury to decide the case themselves). Accordingly, trial counsel was not ineffective for failing to object to the jury instruction concerning the testimony of Jones.

Moreover, Appellant has failed to demonstrate that he was prejudiced by the clarifying instruction offered by the trial court. Appellant has not shown that there is a reasonable

probability that, but for counsel's alleged error, the outcome of his case would have been different. *See Pierce,* 786 A.2d at 221–22. Therefore, trial counsel was not ineffective for failing to object to the jury instruction and appellate counsel was not ineffective for failing to raise a claim that had no merit on direct appeal. *See McGill,* 832 A.2d at 1022.

Appellant's eighth and final claim is that trial counsel was ineffective for failing to object to the penalty phase instruction implying that the jury must find any mitigating circumstances unanimously. Appellant argues that the instruction of the trial court violated the mandate of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), by requiring that the jury unanimously find any mitigating circumstances before they could be weighed against any aggravating circumstances.

During the penalty phase hearing, the court instructed the jury as follows:

Once again, you're reminded that your verdicts must be unanimous. It cannot be reached by majority vote or by any percentage vote. It must be the verdict of each and every one of you.

Bear in mind, remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstances, or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances that you have found.

In all other cases, your verdict must be a sentence of life imprisonment.

(N.T., May 22, 1987, page 2444). Appellant argues that this instruction improperly directed the jury that they could not consider any mitigating circumstances unless they unanimously found them to exist.

 Imposition of the death penalty requires a unanimous jury. The entire jury must find aggravating circumstances unanimously. *Commonwealth v. Jermyn,* 551 Pa. 96, 709 A.2d 849, 869 (1998), *habeas corpus granted in part sub*

*nom. Jermyn v. Horn,* 1998 WL 754567 (M.D.Pa. Oct.27, 1998) (unpublished memorandum), *aff'd,* 266 F.3d 257 (3d Cir.2001). On the other hand, single jurors may find mitigating circumstances individually and personally. *Id.; Commonwealth v. Begley,* 566 Pa. 239, 780 A.2d 605, 644 (2001). In cases where a substantial risk exists that jury instructions could be understood as requiring unanimity as to mitigating circumstances, *Mills* mandates that the sentence be vacated. *See Commonwealth v. Holland,* 556 Pa. 175, 727 A.2d 563 (1999), *habeas corpus granted in part sub nom. Holland v. Horn,* 150 F.Supp.2d 706 (E.D.Pa.2001).

Recently, in *Beard v. Banks,* 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004), the United States Supreme Court held that the decision in *Mills* established a new constitutional rule of law that could not be applied retroactively to cases in which the defendant's conviction became final prior to *Mills.* The U.S. Supreme Court issued its decision in *Mills* on June 6, 1988. In this case, the alleged improper instruction was given by the trial court on May 22, 1987. However, Appellant's Judgment of Sentence did not become final until December 1, 1997, when the U.S. Supreme Court denied *certiorari. See* 42 Pa.C.S. § 9545(b)(3). Nevertheless, the conviction of Appellant became final without any *Mills* claim being properly raised or preserved before the trial court or on direct appeal. As such, Appellant's unpreserved *Mills* claim is deemed waived and cannot serve as a basis for relief pursuant to the PCRA. *See* 42 Pa.C.S. § 9544(b).

In order to avoid the potential waiver of his *Mills* claim under the PCRA, Appellant couches his argument in terms of trial counsel ineffectiveness. However, trial counsel will not be deemed ineffective for failing to anticipate a change in the law. *Commonwealth v. Christy,* 540 Pa. 192, 656 A.2d 877, 889 (1995). Consequently, trial counsel was not ineffective for failing to predict the new rule of law announced in *Mills.*

In boilerplate fashion, Appellant also asserts that his appellate counsel was ineffective for failing to raise a *Mills*

claim on appeal. Assuming *arguendo* that appellate counsel was permitted to raise a *Mills* claim on direct appeal under this Court's former relaxed waiver practice, the position of Appellant has been consistently rejected by this Court.

Here, the jury instruction offered by the trial court mirrored the language of the Commonwealth's death penalty statute. The death penalty statute provides:

[T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

*See* 42 Pa.C.S. § 9711(c)(1)(iv). We have consistently held that this statutory language does not "state or infer a requirement that any given mitigating circumstance must be unanimously recognized before it can be weighed against aggravating circumstances in reaching a verdict." *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27, 31 (1989), *cert. denied*, 494 U.S. 1038, 110 S.Ct. 1500, 108 L.Ed.2d 635 (1990). As such, this Court has steadily maintained that an instruction that follows the language of the death penalty statute, such as the instruction given here, does not violate the mandate of *Mills*.[10] *Id.*;

10. We note that the United States Court of Appeals for the Third Circuit has questioned the continuing constitutionality of jury instructions mirroring the language of the Commonwealth's death penalty statute. *See Frey v. Fulcomer*, 132 F.3d 916, 922 (3d Cir.1997), *cert. denied*, 524 U.S. 911, 118 S.Ct. 2076, 141 L.Ed.2d 151 (1998) (finding penalty phase instruction that was substantially similar to express language of the death penalty statute violated rule of *Mills* ). However, this Court has specifically declined to accept the Third Circuit's interpretation on this issue. *Commonwealth v. Breakiron*, 556 Pa. 519, 729 A.2d 1088, 1097 n. 7 (1999); *Commonwealth v. Cross*, 555 Pa. 603, 726 A.2d 333, 337 (1999). Moreover, this Court is not bound to follow the decisions of the Third Circuit interpreting federal law on issues of federal constitutional dimension. See *Hall v. Pa. Bd. of Probation and Parole*, 578 Pa. 245, 851 A.2d 859, 865 (2004) (opinion announcing the judgment of the Court) (explaining that "[w]ithin our federal system of governance, there is only one judicial body vested with the authority to overrule a decision that this Court reaches on a matter of federal law: the United States Supreme Court").

*Commonwealth v. O'Shea*, 523 Pa. 384, 567 A.2d 1023 (1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990). Based upon this Court's established precedent, the penalty phase instruction given by the trial court did not contravene the new rule of law announced in *Mills*. Accordingly, appellate counsel was not ineffective for failing to raise a meritless *Mills* claim on direct appeal. *See McGill*, 832 A.2d at 1022.

## CONCLUSION

For the reasons stated above, Appellant has failed to demonstrate eligibility for relief pursuant to the PCRA. Accordingly, we affirm the Order of the PCRA court.[11]

Justice CASTILLE files a concurring opinion joined by Justice EAKIN, who also joins the majority opinion.

Justice BAER files a concurring opinion.

Justice NIGRO files a dissenting opinion.

Justice SAYLOR files a dissenting opinion.

## CONCURRING OPINION

Justice CASTILLE.

I join the Majority Opinion in its entirety, writing separately only to further address appellant's claim of counsel ineffectiveness for failing to argue on direct appeal that the penalty phase jury charge ran afoul of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), a decision which was rendered over a year after the verdict in this case. Appellant did not have the prescience to predict the new rule in *Mills* and thus lodged no contemporaneous objection to the jury charge on what would later come to be known as *"Mills"* grounds. Appellant now faults his appeal counsel for failing to seek the benefit of *Mills* on appeal, notwithstanding the

11. The prothonotary is directed to transmit a full and complete record of these proceedings to the Governor pursuant to 42 Pa.C.S. § 9711(i).

waiver, by invoking the capital direct appeal relaxed waiver doctrine.[1]

For purposes of deciding this collateral appeal, the Majority assumes *arguendo* that appellant indeed could have secured direct appellate review of his defaulted *Mills* claim by simply invoking the relaxed waiver doctrine. It is of no consequence to assume reviewability at this stage because, as the Majority notes, appellant's *Mills* claim would have failed on the merits under this Court's existing authority. Op. at 554–55. I join the Majority on this particular point because I have no objection to assuming certain points in order to facilitate a disposition, particularly given the typically prolix filings with which this Court is burdened upon capital PCRA review. But, since this Court is likely to encounter this new type of assault upon direct appeal counsel in capital cases with increasing frequency, I believe there are two points worth making about the point assumed by the Majority. First, it is pure speculation whether the Court would have entertained a particular defaulted claim based upon new constitutional authority under the discretionary relaxed waiver doctrine. Indeed, this Court has held that counsel cannot be deemed ineffective on appeal for failing to seek the retroactive benefit of a new constitutional rule that was announced while the appeal was pending, where the claim was not preserved below. *Commonwealth v. (Aaron) Jones*, 571 Pa.112, 811 A.2d 994, 1005 (2002).

Second, there is a fundamental substantive issue that would have to be resolved in the defendant's favor before relief could be granted upon a claim that direct appeal counsel was ineffective in failing to invoke relaxed waiver to seek the benefit of a new federal constitutional rule which was not in existence at the time of trial, and the benefit of which was not sought below. Specifically, there is a strong argument to be made that such an ineffectiveness claim should be governed by the heightened prejudice standard set forth in *Lockhart v.*

1. The discretionary relaxed waiver doctrine formerly applicable in capital cases has been abrogated both on direct review, *see Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), and on PCRA review. *See Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998).

*Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), rather than the prejudice standard governing more typical *Strickland* claims. The *Lockhart* rule is somewhat obscure, and to understand properly its relationship to *Strickland,* it is best simply to reproduce the High Court's most recent description of the doctrine:

> It is true that while the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims, there are situations in which the overriding focus on fundamental fairness may affect the analysis. Thus, on the one hand, as *Strickland* itself explained, there are a few situations in which prejudice may be presumed.... And, on the other hand, there are also situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate "prejudice." Even if a defendant's false testimony might have persuaded the jury to acquit him, it is not fundamentally unfair to conclude that he was not prejudiced by counsel's interference with his intended perjury. *Nix v. Whiteside,* 475 U.S. 157, 175–176, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

Similarly, in *Lockhart* we concluded that, given the overriding interest in fundamental fairness, the likelihood of a different outcome attributable to an incorrect interpretation of the law should be regarded as a potential "windfall" to the defendant rather than the legitimate "prejudice" contemplated by our opinion in *Strickland.* The death sentence that Arkansas had imposed on Bobby Ray Fretwell was based on an aggravating circumstance (murder committed for pecuniary gain) that duplicated an element of the underlying felony (murder in the course of a robbery). Shortly before the trial, the United States Court of Appeals for the Eighth Circuit had held that such "double counting" was impermissible, *see Collins v. Lockhart,* 754 F.2d 258, 265 (1985), but Fretwell's lawyer (presumably because he was unaware of the *Collins* decision) failed to object to the use of the pecuniary gain aggravator. Before Fretwell's claim for federal habeas corpus relief reached this Court, the *Collins* case was overruled. Accordingly, even though

the Arkansas trial judge probably would have sustained a timely objection to the double counting, it had become clear that the State had a right to rely on the disputed aggravating circumstance. Because the ineffectiveness of Fretwell's counsel had not deprived him of any substantive or procedural right to which the law entitled him, we held that his claim did not satisfy the "prejudice" component of the *Strickland* test.

Cases such as *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), and *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), do not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him. In the instant case, it is undisputed that Williams had a right-indeed, a constitutionally protected right-to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer.

*Williams v. Taylor*, 529 U.S. 362, 391–93, 120 S.Ct. 1495, 1512–13, 146 L.Ed.2d 389 (2000) (citations and footnotes omitted); *accord Lockhart*, 506 U.S. at 372, 113 S.Ct. at 844 (prejudice component of *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.... Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him.") (citations omitted).

As the Majority notes, the Supreme Court has held that *Mills* established a new constitutional rule, which is not entitled to retroactive operation upon collateral attack. *Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004). Appellant's trial in this case, which pre-dated *Mills*, unquestionably was conducted in conformity with governing pre-*Mills* law: he was deprived of no substantive or procedural trial right to which the law entitled him. Moreover, since *Mills* does not apply retroactively to those who failed to preserve a

*Mills* claim for direct review, appellant was not entitled to its benefit on appeal once he had failed to lodge an objection below. In such a circumstance, it would be an arbitrary windfall to allow the doctrine of relaxed waiver—a doctrine since abrogated by this Court no less than the *Collins* rule at issue in *Lockhart* was eventually overturned—and ineffective assistance of counsel to permit appellant to upset a final verdict which was fundamentally fair when rendered.[2]

The meaning and significance of the *Beard v. Banks* decision in Pennsylvania capital prosecutions is that trials which preceded *Mills*, such as this one and the prosecution in *Beard v. Banks*, should not be subject to *Mills* review unless the defendant actually lodged an objection to the charge upon grounds which are the same as those grounds ultimately accepted in *Mills*. Where the claim was defaulted at trial, as here, no colorable claim of ineffective assistance of counsel arises.

Justice EAKIN, who also joins the majority, joins this concurring opinion.

## CONCURRING OPINION

Justice BAER.

I join the majority's decision in all respects. I write separately, however, to express my disagreement with the conclusion that the language of the instructions given to the jury at the penalty hearing, which mirrors the language of Section 9711(c)(1)(iv) of the Pennsylvania Death Penalty Statute, 42 Pa.C.S. § 9711(c)(1)(iv), does not impermissibly infer a requirement that any mitigating circumstance must be found unanimously by the jury.[1] To the contrary, in my view, the

2. It might be a different circumstance if the defendant could point to an identically situated appellant, whose direct appeal counsel in fact secured the benefit of the new rule by invoking relaxed waiver, resulting in an award of appellate relief. Such is not the case here.

1. Section 9711(c)(1)(iv) provides:
 [T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d)

language employed by the trial judge specifically instructed the jury that mitigating circumstances must be found unanimously. As quoted by the majority, the relevant instructions provide:

Once again, you're reminded that your verdicts must be unanimous. It cannot be reached by majority vote or by any percentage vote. It must be the verdict of each and every one of you.

Bear in mind, remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstances, or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances that you have found.

In all other cases, your verdict must be a sentence of life imprisonment.

Majority op. at 553.

Despite my view in this regard, this Court has quite clearly held that an instruction which follows the language of the death penalty statute, such as the one given here, does not violate the mandate of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (holding that the sentence of death must be vacated where a substantial risk exists that jury instructions could be understood as requiring unanimity as to mitigating circumstances). *See Commonwealth v. Frey,* 520 Pa. 338, 554 A.2d 27, 31 (1989), *cert. denied,* 494 U.S. 1038, 110 S.Ct. 1500, 108 L.Ed.2d 635 (1990) (holding that the language of the death penalty statute does not "state or infer a requirement that any given mitigating circumstance must be unanimously recognized before it can be weighed against aggravating circumstances in reaching a verdict."); *Commonwealth v. O'Shea,* 523 Pa. 384, 567 A.2d 1023 (1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990) (holding that an instruction that follows the language of the

and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

death penalty statute does not violate the mandate of *Mills.*); *Commonwealth v. Stokes,* 576 Pa. 299, 839 A.2d 226, 228 (2003) (verdict slip that followed the language of the death penalty statute was not misleading and did not infer requirement that any mitigating circumstances must be unanimous).

Accordingly, based upon the principle of *stare decisis,* I join the majority opinion.

### DISSENTING OPINION

Justice NIGRO.

I dissent, as I agree with Justice Saylor that Appellant is entitled to an evidentiary hearing on his claim that counsel was ineffective for failing to object to the trial court's instructions as to vicarious criminal liability.

### DISSENTING OPINION

Justice SAYLOR.

I respectfully dissent and write to the following points.

First, I have difficulty with majority's discussion of the district attorney's reference to sodium amitol or "truth serum" in his cross-examination of Appellant's expert psychologist. *See* Majority Opinion, *op.* at 545–47. Narcoanalysis has not been recognized by this Court as a reliable scientific methodology particularly as concerns the process of truth determining, and notably, many other jurisdictions exclude evidence adduced thereby as unreliable. *Cf.* 23 C.J.S. *Criminal Law* § 971 (2004) (observing that, "[g]enerally, the defendant's statements made while under the influence of a truth serum are not admissible in evidence in a criminal trial").[1] Particu-

---

1. As summarized by one set of commentators:
 [D]rugs are not "truth sera." They lessen inhibitions to verbalization and stimulate unrepressed expression not only of fact but of fancy and suggestion as well. Thus, the material produced is not "truth" in the sense that it conforms to empirical fact. Finally, it is most important to realize that the conduct of the interrogation and the analysis of its verbal and behavioral content are exceedingly complex.

\* \* \*

larly given the fairly strong connotations, and potential misconceptions, associated with a suggestion that there may be an actual, available "truth serum," I would specifically disapprove casual references to a defendant's (or his expert's) failure to utilize such a device as a cross-examination tactic.[2]

Concerning Appellant's claim related to the district attorney's characterization of various of his statements as lies, *see* Majority Opinion, *op.* at 546–49, I believe that it should be acknowledged that the Court over time has gradually relaxed the governing review standard. In *Commonwealth v. Potter*, 445 Pa. 284, 285 A.2d 492 (1971), the Court issued a strong pronouncement condemning a prosecutor's characterization of a defendant's testimony as a malicious lie. The Court held that the reference constituted an impermissible personal opinion in violation of standards promulgated by the American Bar Association, and that the effect was highly prejudicial and warranted a mistrial. *See id.* at 286–87, 285 A.2d at 493. It is difficult to read *Potter* as other than announcing a *per se* rule proscribing branding the defendant a liar, or his statements as lies. In *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365 (1984), however, the Court found a district attorney's statement that a defendant "out and out lied" to the jury did not constitute actionable prosecutorial misconduct, because it represented a "fair inference from irrefutable evidence." *See id.* at 93–94, 484 A.2d at 369. Then in *Commonwealth v. Ragan*,

Thus the bare results of an interview under the influence of drugs should not, standing alone, be considered a valuable and reliable indicator of the facts. As a sole procedure, narcoanalysis is not sufficiently reliable.
Dession, Freedman, Donnelly & Redlich, *Drug–Induced Revelation and Criminal Investigation*, 62 YALE L.J. 315, 319–29, 342 (1953).

**2.** The case for admissibility of evidence obtained via narcoanalysis may be strongest in the context of a medical opinion concerning a defendant's competency, *accord* JOHN W. STRONG, MCCORMICK ON EVIDENCE § 206 (5th ed.2003). Although Appellant had placed his competency at issue by challenging his confession on the basis of his asserted mental deficiencies, the district attorney was clearly pursuing a simple truth—determining angle, as his questions were directed toward suggesting that Appellant's assertion of a diminished mental condition was contrived. Moreover, and again, I believe that the matter of narcoanalysis is far too complex to be invoked casually by the government as a device on cross-examination, particularly of a school psychologist.

538 Pa. 2, 645 A.2d 811 (1994), the Court appears to have substituted a lesser requirement of a "fair inference based on the evidence," *see id.* at 38–39, 645 A.2d at 829, for the former one of "fair inference from irrefutable evidence." This, of course, seems to permit (or at least allow without consequence) commentary on lying in any case in which the defendant testifies or has given a statement tending to shift or lessen his blameworthiness (because in such cases there will always be evidence to the contrary, or the Commonwealth's case would not have survived a probable cause hearing or motion for a directed verdict). Here, in addition to following *Ragan's* revised standard, the majority also expressly invokes the general standard for assessing prosecutorial misconduct. *See* Majority Opinion, *op.* at 547. Therefore, although the Court has never expressly said so, it would appear that there is nothing left of *Potter's per se* rule.

While I tend to agree with the majority that a *per se* approach is not the best one, the concerns that motivated the *Potter* Court are not without foundation. In this regard, I agree with the sentiments of the Delaware Supreme Court as follows:

> In our opinion, "liar" is an epithet to be used sparingly in argument to the jury. It is a flashboard more likely to create heat in a contentious courtroom than it is to illuminate the search for the truth. But, more particularly, the prosecutor who labels testimony as a lie runs the risk of passing from a legitimate inference drawn from the evidence ... to the expression of an impermissible personal opinion.

*Hughes v. State,* 437 A.2d 559, 571 (Del.1981).

In this case, I would hold that the district attorney's remarks exceeded the range of permissible conduct. In the first instance, I recognize that his challenge to Appellant's truthfulness was warranted, particularly in light of the inconsistencies in Appellant's statements, and as Appellant's counsel in his summation had attempted to mitigate the damage from Appellant's incriminatory statements by accusing the police of overreaching by scripting the worst of those statements. *See*

N.T., May 15, 1987, at 1886, 1895–97 (trial counsel summation). The district attorney's response, however, was unduly inflammatory—not only did the district attorney expressly and repetitively indicate that Appellant's statements were lies, he also attempted to personalize the matter vis-à-vis the jury panel. *See, e.g.,* N.T., May 15, 1987, at 1957 (district attorney summation) (commenting that "you realize that [Appellant is] no fool but he thinks you are."). This sort of commentary transgresses outside the realm of fair argumentation based on the evidence.

On the above issues, I might be able to find an absence of sufficient prejudice to require a new trial on derivative claims raised in the post-conviction setting. However, I also find merit in Appellant's claim that the trial court's instructions as to vicarious criminal liability violated the dictates of *Commonwealth v. Huffman,* 536 Pa. 196, 638 A.2d 961 (1994), and his counsel were ineffective for failing to raise and preserve the resultant, prejudicial error. In this case, the trial court gave a first-degree murder instruction substantially identical to that which the *Huffman* Court characterized as a patently erroneous statement of the law resulting in a miscarriage of justice. *Compare* Majority Opinion, *op.* at 550 (quoting N.T., May 19, 1987, at 2145), *with Huffman,* 536 Pa. at 198–99, 638 A.2d at 962.

The majority indicates that two other portions of the charge cure the *Huffman* defect. The first portion of the instructions cited by the majority merely defines the circumstances under which a defendant may be deemed to be an accomplice. *See* Majority Opinion, *op.* at 550–51 (quoting N.T., May 18, 1987, at 2108–09). It does not, however, address the subject of *Huffman,* namely, the expanded scope of vicarious criminal liability for other offenses that may ensue once a defendant is found to be an accomplice and/or coconspirator. *See Huffman,* 536 Pa. at 198–201, 638 A.2d at 962–63. The trial court discussed this central issue of scope in separate passages of its instructions in ordinary terms (and not on the special terms required by *Huffman* in first-degree murder cases), including the passage complained of by Appellant. *See also* N.T., May

18, 1987, at 2103 ("What's the coconspirator rule? When two or more persons conspire or combine with one another to commit an unlawful act, each is criminally responsible for the acts of his associates or his coconspirators committed in furtherance of their common design. In contemplation of the law, the act of one is the act of all."); *id.* at 2112 ("Each accomplice is equally accountable for all acts committed pursuant to the original common criminal purpose or design, even if the specific act was not fully expected, intended, anticipated, or preplanned.").[3]

The other passage cited by the majority is the trial court's indication that specific intent to kill is an essential element of the offense of first-degree murder. *See* Majority Opinion, *op.* at 550–51. This charge, however, is phrased in terms of direct criminal liability and does not eliminate the possibility of jurors relying on the vicarious liability instructions to otherwise find Appellant guilty of first-degree murder. This is precisely why the *Huffman* Court recognized a special rule for first-degree murder cases in which vicarious liability is charged. *Accord Commonwealth v. Chester,* 557 Pa. 358, 380 n. 12, 733 A.2d 1242, 1253 n. 12 (1999) ("A general accomplice charge, while legally correct on the law of accomplice liability, when given in conjunction with a charge of first degree murder, must clarify for the jury that the specific intent to kill necessary for a conviction of first degree murder must be found present in both the actual killer and the accomplice."). Moreover, the specific intent charge given in relation to the Commonwealth's assertion of direct criminal liability was also issued in *Huffman,* as it is in all first-degree murder cases. Indeed, its absence alone would be a fatal defect, as there would be no basis for a finding of direct criminal liability.[4]

3. I realize that the Court has recently approved similar general vicarious liability instructions in a first-degree murder case, absent the mandated specialized instruction, thus implicitly overruling *Huffman.* *See Commonwealth v. Speight,* 578 Pa. 520, 535–38, 854 A.2d 450, 459–60 (2004). It is my position, however, that it is appropriate to adhere to established precedent unless and until the Court expressly undertakes to overrule it. This simply was not done in *Speight.*

4. Concerning the ineffectiveness dynamic, although this case was tried before *Huffman's* issuance, and counsel cannot be deemed ineffective

I acknowledge that the Court has declined to deem a *Huffman* defect prejudicial where a defendant is also convicted of a conspiracy to kill, as such objective presupposes the requisite specific intent. *See Commonwealth v. Wayne,* 553 Pa. 614, 633, 720 A.2d 456, 465 (1998). Here, however, the conspiracy charged involved multiple objectives (rape and/or murder, *see* N.T., May 18, 1987, at 2096), and the jury did not differentiate between those objectives in rendering its verdict. Accordingly, the jurors may have believed (consistent with the most damaging of Appellant's statements) that Appellant's own intent was limited to the objective of rape, but may nevertheless have convicted him of first-degree murder based on the court's vicarious criminal liability instructions. *Accord Huffman,* 536 Pa. at 199, 638 A.2d at 963. In such circumstance, under the law as the jury should have been instructed, although Appellant would have been guilty of second-degree murder, he would not have been death eligible.

In the circumstances, it is my position that Appellant was due, at a minimum, a hearing in the post-conviction court, in line with the approach recently applied in *Commonwealth v. Duffey,* 579 Pa. 186, 203–05, 855 A.2d 764, 775–76 (2004) (citing *Commonwealth v. McGill,* 574 Pa. 574, 588, 832 A.2d 1014, 1022 (2003)), although it would seem that a strong inference of deficient stewardship on the part of counsel should attach to the failure to object to (and to preserve a claim of error in relation to) an instruction that has been characterized by this Court as patently erroneous and as causing a miscarriage of justice.

As a final point, I note my agreement with Mr. Justice Baer's position that the trial court's penalty-phase instructions are not harmonious with the United States Supreme Court's subsequent decision in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

---

for failing to anticipate a new rule of law, *Huffman* did not implement such a rule, but merely applied existing precedent established at least as of 1982. *See Huffman,* 536 Pa. at 199, 638 A.2d at 962 (citing *Commonwealth v. Bachert,* 499 Pa. 398, 406, 453 A.2d 931, 935 (1982)).