[J-82A-2013 AND J-82B-2013] [MO: Eakin]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, : | No. 668 CAP |
| : | |
| Appellant : | Appeal from the Order of the Court of |
| : | Common Pleas of Philadelphia County, |
| : | Criminal Division, entered on September |
| v. : | 28, 2012, at No. CP-51-CR-0823621, |
| : | granting a Stay of Execution |
| : | |
| TERRANCE WILLIAMS, : | |
| : | |
| Appellee : | SUBMITTED:  September 18, 2013 |
| : | |
| COMMONWEALTH OF PENNSYLVANIA, : | No. 669 CAP |
| : | |
| Appellant : | Appeal from the Order of the Court of |
| : | Common Pleas of Philadelphia County, |
| : | Criminal Division, entered on September |
| v. : | 28, 2012, at No. CP-51-CR-0823621, |
| : | granting a Stay of Execution |
| : | |
| TERRANCE WILLIAMS, : | |
| : | |
| Appellee : | SUBMITTED:  September 18, 2013 |

## CONCURRING OPINION

**MR. CHIEF JUSTICE CASTILLE**                    **DECIDED:  December 15, 2014**

I join the Majority Opinion.  Indeed, in my view, both the Brady[1] claim appellee

initially raised, and the Brady claim later uncovered by the PCRA[2] court and upon which

---

[1] Brady v. Maryland, 373 U.S. 83 (1963).

[2] Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546.

the court granted relief, are time-barred and frivolous. I write separately to expand upon the Majority discussion, and to address the important responsibilities of the PCRA trial courts in serial capital PCRA matters, an issue brought into stark relief by the extraordinary, and unauthorized, measures undertaken by the PCRA court in this case.

Preliminarily, with respect to the latter concern, I note that this is a case involving a **fourth** PCRA petition filed by federal lawyers only after appellee was denied federal *habeas corpus* relief. The fourth petition was time-barred on its face -- offering a new, recanting witness (a friend and cohort of appellee) for the same "facts" and theory appellee had long-known and already litigated – and was blatantly frivolous, filed by the FCDO[3] in a transparent effort to induce further delay. Rather than decide the claim actually presented in the efficient manner this sort of last-ditch capital litigation requires, the court below unfortunately strayed from its institutional duties. In the process, the PCRA court: ignored the strictures of PCRA jurisdiction and the appropriate parameters for discovery procedures and evidentiary hearings in serial petition matters; misapprehended what Brady discovery encompasses; misapprehended the substantive law concerning Brady materiality; and, most troubling, lost sight of its role as a neutral judicial officer. As a result, a warrant of execution was enjoined by a trial judge for no valid reason, on the basis of a frivolous fourth PCRA petition, leaving insufficient time for this Court to timely review the judge's injunction of the Governor's warrant.[4]

The PCRA court per the Honorable Teresa Sarmina, justified its actions based on what it viewed as gamesmanship by the Commonwealth in allegedly withholding

---

[3] Federal Community Defender's Office.

[4] Appellee cross-appealed the order below, presumably to the extent the PCRA court denied his other claims, but later discontinued that appeal by praecipe. See 673 CAP.

relevant information from appellee. If trial level prosecutorial "gamesmanship" is revealed and is relevant, it obviously warrants notation and condemnation. But, to be relevant in a case involving a fourth PCRA petition raising a <u>Brady</u> claim, the petition would have to be proven timely (to vest jurisdiction), and the uncovered <u>Brady</u> claim would need to possess merit, which both the claim raised in this petition, and the different claim found by the PCRA court, do not. Furthermore, in the <u>Brady</u> arena, before condemning officers of the court, the tribunal should be aware of the substantive status of <u>Brady</u> law both at the relevant time and today.[5] And, just as a preview: <u>Brady</u> does not authorize searching through the government's files -- not at trial, not on collateral attack, and especially not on a fourth PCRA petition. This case presents a supervisory issue concerning the manner in which trial courts handle serial petitions in capital cases that I believe requires highlighting and disapproval.

As noted, I will write also to expand upon why the claim raised by appellee, as well as the different claim discovered by the PCRA court, misconceives <u>Brady</u>.

---

[5] To the extent the alleged non-disclosures here involved matters found when the PCRA court searched police files, it should be stressed that the investigation and prosecution (murder in 1984; conviction in 1986) preceded, by many years, the U.S. Supreme Court's decision in <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995), which first held that the prosecution's <u>Brady</u> obligation extends to exculpatory materials known to others acting on the relevant government's behalf, including the police. Prior to <u>Kyles</u>, in Pennsylvania, the law was that prosecutors were not responsible for the content in police files. <u>See</u> <u>Commonwealth v. Burke</u>, 781 A.2d 1136 (Pa. 2001) (abrogating prior cases). The consequent distortions in this case are not unusual in this unique area of law where cases continue to be litigated decades after trial, and federal lawyers contend that new rules or innovative rules govern collateral attacks on old cases. Any finding of misconduct respecting this nearly thirty-year old case, then – and I do not dispute the concern, even if there was zero exculpatory material to support a viable <u>Brady</u> claim – must be tempered by awareness of the governing law at the relevant times, as well as the fact that the <u>Brady</u> focus is not on **any** evidence, but only on exculpatory evidence and materiality.

## I. The FCDO Agenda as Necessary Prologue

As I noted in a recent case involving a retroactive <u>Atkins</u>[6] claim raised by the FCDO: The FCDO's significant federal resources, "represented by its cadre of lawyers and roster of experts, are deployed throughout the Commonwealth; individual trial courts, and county prosecutors for that matter, who see only the occasional capital case, may be unaware of the bigger picture, and the strategy at work. This extraordinary shadow capability of the FCDO, and its demonstrated tactics, give me additional pause…." <u>Commonwealth v. Hackett</u>, 99 A.3d 11, 40-41 (Pa. 2014) (Castille, C.J., concurring). It has only recently emerged just how pervasive a presence the FCDO has made itself in Pennsylvania capital cases. Almost invariably without legitimate court appointment, and without any Pennsylvania authority's approval or role of oversight, this "private" group of federal lawyers pursuing an obstructionist anti-death penalty agenda have essentially anointed themselves as a statewide, *de facto* capital defender's office. Common tactics of the FCDO include multiple attempts to delay and obstruct cases, as well as attempts to unsettle and undermine Pennsylvania law. <u>See generally</u> <u>Commonwealth v. Spotz</u>, 99 A.3d 866 (Pa. 2014) (Single Justice Opinion on Post-Decisional Motions by Castille, C.J.) (collecting cases and tactics).

One common tactic is that, immediately after one round of review fails, the FCDO "discovers" a new claim and initiates a new round of delay-inducing review. <u>See</u>, <u>e.g.</u>, <u>id.</u>; <u>Commonwealth v. Porter</u>, 35 A.3d 4 (Pa. 2012); <u>Commonwealth v. Abdul-Salaam</u>, 996 A.2d 482 (Pa. 2010). In this case, that is exactly what the FCDO did. Appellee already had a full direct appeal, three rounds of PCRA review and appeal, and a full round of federal *habeas corpus* review and appeal when the FCDO happened upon

---

[6] <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002).

"new" evidence and filed this fourth PCRA petition which, in fact, merely reiterated the same evidence and a theory it had already litigated and which was found to be meritless. The PCRA court below should have decided the claim actually presented to it, while maintaining a proper perspective. And, it has become apparent that PCRA courts throughout Pennsylvania need to be vigilant and circumspect when it comes to the activities of this particular advocacy group, to ensure that the FCDO does not turn PCRA proceedings, and in particular serial proceedings, into a circus where FCDO lawyers are the ringmasters, with their parrots and puppets as a sideshow.

### II. The Brady Issue Raised by the FCDO was Time-Barred and Frivolous

This fourth PCRA petition was filed by the FCDO in March of 2012, immediately after appellee's federal *habeas* attack on his conviction failed. Appellee's final appropriate prospect for relief was through mercy: the clemency process. The FCDO was appointed to represent appellee for purposes of pursuing state clemency. Nevertheless, the FCDO proceeded to file yet another PCRA petition.

The FCDO alleged prosecutorial suppression of information allegedly provided to the police and the prosecutor during witness preparation sessions by appellee's friend and cohort-in-murder Marc Draper – who was convicted for his own role in the murder and is serving life in prison, who testified contrarily at appellee's trial, and has nothing to lose by now lying for his friend -- and the Reverend Charles Poindexter. Draper claimed that he had told the arresting officers, as well as the prosecutor, that the victim, Amos Norwood, was a homosexual, that Norwood and appellee were involved in a sexual relationship, and that the murder was about that relationship. What was obfuscated by Draper and the FCDO was that this information could only have been learned through appellee's own communications with Draper, since appellee obviously knew his "true"

motivation; or else it was just Draper's irrelevant opinion. Draper further claimed that police told him to testify that the motive for the murder was robbery. Appellee also included a "declaration" from Poindexter (who had testified for the Commonwealth at the guilt phase of trial), claiming he had learned from police that the victim would sometimes meet gay men in a house or an apartment.

From this information, the FCDO constructed a claim that the Commonwealth suppressed "exculpatory" evidence of the relationship between appellee and the victim and appellee's supposed "true" motivation for the murder – again, as if appellee himself did not know his own true motivation -- which could have been used to rebut elements of first-degree murder and to undermine the death penalty. The argument was akin to a "bad faith" argument, *i.e.*, the Commonwealth had argued that a churchgoing man was robbed and murdered by appellee and Draper, despite knowing that appellee may have had a different relationship with the victim, and a different motivation that he was keeping to himself.

As the Majority explains, the information alleged in this fourth petition not only was obviously known to appellee, but it also was irrelevant to the trial proceedings (the focus of Brady) because the defense -- offered through appellee's testimony -- was one of innocence and non-involvement. In short, appellee chose to lie. In addition, the Draper and Poindexter statements – conveniently secured by the FCDO only after losing in federal court -- rehashed the same information concerning the victim's character and appellee's "true" motivation for the murder already litigated in the first PCRA proceeding. Thus, the FCDO's last-ditch Brady claim consisted of evidence already known to appellee, a claim already litigated by appellee, and a contrary defense theory springing from an admission that appellee perjured himself at trial. The PCRA court should have taken the frivolous issue as the FCDO presented it and dismissed it

as time-barred. The court inexplicably did not; and instead, the frivolous issue now before this Court is a different Brady claim never raised by appellee until prompted to do so by the PCRA court, after the issue was uncovered by the PCRA court itself only by losing sight of fundamental precepts, including its role as neutral arbiter.

### III. PCRA Court's "Discovery"

A PCRA court is without jurisdiction when a serial petition is filed (assuming it is filed more than one year from the date the judgment of sentence became final, as it was here) unless it falls within one of three limited exceptions. 42 Pa.C.S. § 9545. In all PCRA petitions, the burden is on the PCRA petitioner to establish an exception to the one-year jurisdictional time-bar, before the court can act. Moreover, the rules governing discovery in PCRA matters explicitly state that no discovery is permitted for first counseled petitions except "upon leave of court after a showing of good cause," Pa.R.Crim.P. 902(E)(2); while in serial cases such as this one, discovery is not permitted "except upon leave of court after a showing of exceptional circumstances." Rule 902(E)(1). These are this Court's Rules: not niceties to be done away with perhaps because of some unease with capital cases.

Nothing in the Rules authorizes a PCRA court to demand the government's thirty-year-old files and for the court itself to go searching for information and new claims – all without jurisdiction being established. This is true whether the case is a capital case or not – the difference of a death sentence does not create jurisdiction, or derivative power, where it does not exist.

These Rules are neither arbitrary nor mere aspirations. The PCRA Rules square with Brady, which does not command an open-file policy, or a "sporting system" of discovery. See Brady, 373 U.S. at 90-91. Thus, even where, unlike here, serial petition

jurisdiction is established and the petitioner demonstrates exceptional circumstances to warrant some form of discovery, such orders do not properly encompass simply seizing and rummaging about in the government's files.

> [T]he [U.S. Supreme] Court has noted that the duty imposed upon the prosecution under <u>Brady</u> is a limited one. <u>See</u>, <u>e.g.</u>, <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977) ("[t]here is no general constitutional right to discovery in a criminal case, and <u>Brady</u> did not create one"); <u>see</u> <u>also</u> <u>Kyles</u>, 514 U.S. at 436–37, 115 S.Ct. at 1567 ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.... We have never held that the Constitution demands an open file policy ...."). This Court has also recognized <u>Brady</u>'s limited requirements, and has noted that <u>Brady</u> does not grant a criminal defendant unfettered access to the Commonwealth's files. <u>See</u> <u>Commonwealth v. Edmiston</u>, 578 Pa. 284, 851 A.2d 883, 887 n. 3 (2004) (defendant has no general right under the Constitution or *Brady* to search Commonwealth files); <u>Commonwealth v. Williams</u>, 557 Pa. 207, 732 A.2d 1167, 1176 (1999) ("[T]he Commonwealth is, in the first instance, the judge of what information must be disclosed.... 'Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.' ") (quoting <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987)); <u>Commonwealth v. Counterman</u>, 553 Pa. 370, 719 A.2d 284, 297 (1998), <u>cert. denied</u>, 528 U.S. 836, 120 S.Ct. 97, 145 L.Ed.2d 82 (1999) (<u>Brady</u> is not a general rule of discovery in criminal cases).

<u>Commonwealth v. Lambert</u>, 884 A.2d 848, 854 (Pa. 2005).

This Court's Rules, likewise and for similar good reason, do not empower a PCRA judge to hold evidentiary hearings in a serial petition case in advance of a demonstration of jurisdiction. Appellee already had five full rounds of review. Hearings are appropriate – after jurisdiction is established – only if there has already been an actual demonstration of a genuine issue concerning any material fact. <u>See</u> Pa.R.Crim.P. 908(A)(2), 909(b)(2). A new and different <u>Brady</u> claim discovered by the PCRA judge's own unauthorized, and unlimited, "investigation" – conducted after a serial PCRA petition is filed and not yet assessed for jurisdiction -- cannot operate to

render the petition timely when filed. Likewise, information obtained from the government's files after the PCRA court improperly ordered seizure of the information without foundation cannot retroactively operate to validate the improper serial petition "discovery" order (or "seizure" order, in this case) in the first instance.

During one of the earliest hearings after an execution date was set in this matter, the PCRA court recognized that Draper's affidavit was insufficient to warrant an evidentiary hearing. Nevertheless, the court essentially directed appellee to procure a third affidavit from Draper to see whether appellee could establish a strong showing of success on the merits which, in the mind of the court, was necessary in order to warrant an evidentiary hearing with a death warrant pending. N.T., 9/10/12, at 86-87. Following submission of the third affidavit, the court then ordered an evidentiary hearing to receive testimony from Draper and the trial prosecutor (who was no longer with the District Attorney's Office). Prior to this hearing, the court entered an order prohibiting the parties from communicating about the case with Draper or the trial prosecutor and further ordered the trial prosecutor to bring any documents in her possession related to the case to the evidentiary hearing. The court then ordered the prosecutor's office to give access to the case files to the trial prosecutor, via an e-mail the judge sent to the parties.

A subsequent e-mail from the court took the even more lawless step of essentially opening the prosecutor's files to appellee's counsel, as the judge directed that appellee was permitted to review any of the documents reviewed by the trial prosecutor. Then, in another e-mail sent on Saturday, September 22, 2012, the court's clerk directed the Commonwealth to secure the police department's homicide files in

this case and the Herbert Hamilton murder case[7] because "the judge wants to review everything in the possession of the police department about these two cases." See Attachment to "Commonwealth's Motion to Complete the Record," filed 10/26/12. The PCRA court's examination of these files provided the basis for the examination of the witnesses at the evidentiary hearing, including an extended cross-examination by Judge Sarmina herself.

Ignoring the jurisdictional time-bar and the rules of procedure, and all in a truncated death warrant time-frame leaving little time for appellate review in two court systems, the PCRA court essentially seized the files of the Commonwealth and the police for no legitimate reason (and certainly not based upon the required actual defense showing of exceptional circumstances), independently reviewed the materials, and then used that which was uncovered by the court to examine witnesses at an evidentiary hearing again scheduled for no legitimate reason. The court also entered some of the documents into the record on its own without any motion or prompting by appellee. Only thereafter, during the September 25th hearing, did appellee ask permission to amend the fourth PCRA petition to include the new allegations raised by the documents the judge had found, and the court immediately granted the request, reasoning that Chapter 900 of the Rules of Criminal Procedure – the same chapter containing the Rules respecting discovery and evidentiary hearings that were of no concern to the judge – supposedly indicated that there should be a liberal ability to amend, "even if it is at this late stage." N.T., 9/25/12, at 78.

Unfortunately, the PCRA court apparently allowed itself to be compromised by the fact that this was a capital case that was proceeding under an execution warrant.

---

[7] Herbert Hamilton, another older man with whom appellee had a sexual relationship, was the first person appellee murdered.

But, that is what happens, thirty years on, after a condemned capital petitioner has already exhausted five full rounds of review, and his federal lawyers try another longshot at delaying the case. Also, in taking these extreme, activist measures, the court cited a belief – proper enough in some spheres, and thus recognized in specific doctrines -- that "death is different." The judge added: "This is not any regular, old PCRA, including in a non-capital case." N.T., 9/14/12, at 69. No, it was not an ordinary case, but not for the reason cited by the court: it was a last-ditch fourth state collateral petition, filed by the FCDO no less, after federal review had concluded, rehashing old claims that just happened to involve a two-time murderer finally facing the execution of his sentence.

This case demonstrates that the "difference of death" when reduced to an unmoored slogan causes mischief. The slogan does not create PCRA jurisdiction, and jurisdiction must be proven before the PCRA court can act. The difference of death is not a ground for ignoring this Court's Rules of Procedure, which specifically apply to – and in many instances exist specifically because of -- capital cases. The difference of death also does not alter a trial court's crucial role as a neutral arbiter to pass upon the timeliness, and if timely, the merits of the claims that a serial PCRA petition actually raises. Five Ninth Circuit jurists recently commented on the abuse of the "death is different" notion in a dissent, explaining that the rule of law must be paramount:

> Whatever they are, motivations are beside the point. We should follow the law. Instead, we lay flame to orderly case-processing rules, comity due to state court judgments, and principles of finality. "[Fire's] real beauty is that it destroys responsibility and consequences. A problem gets too burdensome, then into the fire with it." Ray Bradbury, *Farenheit 451* 109 (Simon & Schuster 2012). We should be more cautious.

Henry v. Ryan, 766 F.3d 1059, 1072 (9th Cir. 2014) (Tallman, J., dissenting, joined by O'Scannlain, Callahan, Bea, & Ikuta) (dissenting from grant of *en banc* review in case

where time for Circuit reargument had long passed, and U.S. Supreme Court had already denied *certiorari*). Ultimately, the PCRA court here lost sight of its limited, albeit crucial, role.

As a consequence, the PCRA court steered its own course away from the actual <u>Brady</u> claim presented in this time-barred serial petition; and the <u>Brady</u> claim forming the basis for the penalty phase relief the PCRA court granted could not retroactively establish jurisdiction so as to justify the lawless discovery and evidentiary hearing that had already occurred per the court's *sua sponte* directives. To make matters even worse, the claim the court discovered on its own was simply a different, frivolous <u>Brady</u> claim.

### IV. <u>Brady</u> Law

The 1984 murder here was appellee's second murder. His first murder victim, Herbert Hamilton, was another man with whom he had a sexual relationship, a relationship appellee denied. At the trial in this case, appellee testified to his absolute innocence, claiming he did not even know the victim. As all now agree, this sworn testimony was a lie since appellee not only knew the victim, but he had an ongoing homosexual relationship with him. But, it is the story appellee elected to tell the jury in the hopes, however desperate, of an acquittal. It is not the first time a criminal defense was premised upon a lie, but it is a defendant's right to pursue the defense he chooses (even if it risks a subsequent perjury prosecution, which is hardly a disincentive to a serial murderer in appellee's circumstances).

The new <u>Brady</u> claim discovered by the PCRA court's efforts involved "dirt" about the victim: that he was a "homosexual ephebophiliac" who had sexual encounters with male teenagers. Specifically, as explained by the Majority, the claim was that

information that the victim was a homosexual ephebophiliac could have been employed to paint an unsympathetic picture of the victim at the penalty phase. Majority Slip op. at 17. Nothing in the death penalty statute, however, makes slander about a victim a relevant consideration. The death penalty statute does not recognize an exception if the murder victim was a sexual deviant, or even a convicted sex offender; and smearing the victim's character would not rebut the two aggravators the jury found: the commission of a felony (robbery) along with the murder, and the significant history of violent felony convictions, which included the murder of Hamilton, and a Christmas Eve, home invasion gunpoint robbery of an older couple -- where appellee pressed a rifle to the woman's neck and threatened to blow "her fucking head" off, and then fired multiple shots into the wall. Nor would such evidence be probative of a mitigating circumstance. See Commonwealth v. May, 898 A.2d 559, 566 (Pa. 2006) (testimony designed only to smear murder victim's character not relevant; noting as "apt" trial court's analysis that: "it's just as illegal to kill the devil as it is to kill a saint"). And, when the defendant takes the stand and swears he had nothing to do with killing the victim, and did not even know him, it clearly limits his penalty phase options respecting mitigation arising from "the circumstances of the offense."

The linking assumption depends upon a pet Brady theory the FCDO has been raising recently, *i.e.*, that Brady is violated by non-disclosures which, though involving information neither exculpatory nor material in and of itself, in hindsight might have been used by trial counsel to keep the defendant from testifying and perjuring himself, thereby altering the focus of the necessary Brady materiality inquiry. See Commonwealth v. Weiss, 81 A.3d 767 (Pa. 2013) (Castille, C.J., concurring, joined by Eakin J.) (further discussed and quoted *infra*). In the iteration posed here, the theory goes something like this: had additional information about the victim been disclosed, the

defense would have learned appellee's "real" motive for murder (again, as if appellee did not know his motive), and perhaps trial counsel could have convinced appellee not to take the stand and lie, thus opening the door to an attack-the-victim defense at the penalty phase. Even setting aside the irrelevancy of bad character information about a murder victim, <u>Brady</u> does not embrace this sort of perversity, a theory that rewards the defendant's trial perjury.

Furthermore, even if the PCRA court found something "unsporting" about the government's conduct revealed in the government's files that the court seized, and even if evidence of poor "sportsmanship" in discovery angered the judge, that is not the basis for a <u>Brady</u> claim. What matters is the legal point, made by the Majority, that there was nothing exculpatory or material in this information.[8] Appellee always knew of the

---

[8] In concisely summarizing why the PCRA court erred in finding that appellee's reconfigured-by-the-PCRA-court claim did not qualify under the governmental interference exception, based upon information appellee himself had known before trial, and supplemental information which he secured for use in a prior PCRA petition over fifteen years before, the Commonwealth succinctly explains:

> When, at trial, defendant considered it in his interest to deny any sexual relationship with his victims so as to distance himself from their deaths, he made the strategic decision, **independent of any information in the government's possession**, to do so. And when that did not work, and he decided it was in his interest to instead claim in his first PCRA petition that he killed the victims [both here and in the Hamilton case] because they sexually abused him, he had no difficulty marshalling evidence **outside the government's possession** to support that version of events. At no point was his ability to defend against the charges, or to present any claim, constrained by the actions of the trial prosecutor or any other government official. Consequently, his untimely fourth PCRA petition, which he filed more than twenty years after his judgments of sentence became final, did not satisfy the governmental-interference exception to the one-year filing deadline. His petition was time-barred, and the PCRA court's order purporting to grant relief was a jurisdictional nullity that should be reversed.

(…continued)

victim's supposed proclivities; again, the current claim is just another version of the claim raised and litigated by the FCDO fifteen years ago.  Nevertheless, the PCRA court drew a legal conclusion that the evidence respecting the victim was subject to Brady disclosure before the 1986 trial; and, if only the prosecution had disclosed non-exculpatory information already known to appellee about the victim's character, it may have changed appellee's guilt phase decision to testify; and, the theory goes on in speculation, may have altered the outcome of the penalty proceeding.  See Appellee's Brief, at 29-30 (quoting PCRA court opinion).[9]  The notion that this sort of evidence, in the context of a trial where appellee testified and denied any involvement, warrants Brady-based penalty phase relief, is ludicrous.

   As the Majority notes, the U.S. Supreme Court has never held that Brady materiality is measured by the FCDO's effect-on-the-defense-trial-strategy theory; and a serial collateral attack is not the proper place to establish such constitutionally

_____

(continued...)
Commonwealth's Brief as Appellant, 34 (emphasis original).

[9] In point of fact, appellee never so much as offered to prove that, but for the alleged non-disclosure, he would have presented evidence detailing his ongoing, prior sexual relationship with the victim, and then claimed that the relationship was why he murdered the victim.  Furthermore, the decision to testify was defendant's alone; his trial counsel's role was limited to consultation.  In this regard, it is notable that, in the prior PCRA proceeding, where appellee litigated the same basic claim, trial counsel testified that he had negotiated a plea deal where appellee would receive life in prison – the best possible circumstance where appellee faced the death penalty, had substantial aggravators, and the fact of the robbery meant that his best, realistic prospect was a conviction for second-degree murder, which carries a mandatory life sentence.  Counsel consulted with appellee.  But, counsel testified, appellee was adamant that he was not willing to exchange his prayer of a hope for an outright acquittal for a term of life imprisonment.  Appellee told counsel he would rather be executed than spend his life in jail.  No claim but innocence could lead to acquittal, and appellee decided to go that route by then perjuring himself.

innovative new rules. Moreover, it would be absurd to grant <u>Brady</u> relief upon a claim that would involve rewarding a defendant for his own deliberate perjury at trial. I explained the error in this theory in my Concurring Opinion in <u>Weiss</u>:

> The <u>Brady</u> analysis argued by appellant is erroneous for several reasons. First, the U.S. Supreme Court has never embraced his interpretation. Indeed, appellant's claim to the contrary is premised upon a mischaracterization of <u>United States v. Bagley</u>, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Appellant states the following proposition as if it were black-letter law: "The proper <u>Brady</u> inquiry asks what 'course that the defense and the trial would have taken had the defense not been misled' and what impact the misconduct had on 'the preparation or presentation of the defendant's case.' <u>Bagley</u>, 473 U.S. at 683, 105 S.Ct. 3375." … From his assertion that mere effects upon defense preparation, rather than hard evidence, is the measure of <u>Brady</u> materiality, appellant argues his more radical extended rule that he may shield himself from his own prior testimony.
>
> However, <u>Bagley</u> supports neither appellant's "defense effects" root rule, nor his testimonial immunity extension of the rule. Appellant's [FCDO] counsel neglect to note that the <u>Bagley</u> language they cite and quote as governing black-letter law in fact represented the views of only two Justices in <u>Bagley</u>. It is not governing law. I examined and explained the non-precedential effect of this language at some length in my concurring opinion in <u>Commonwealth v. Willis</u>, 616 Pa. 48, 46 A.3d 648 (2012), a direct appeal case. <u>See</u> <u>id.</u> at 674-84 (Castille, C.J., concurring, joined by Eakin and McCaffery, JJ.) (addressing Court's erroneous apprehension of <u>Brady</u> materiality in <u>Commonwealth v. Green</u>, 640 A.2d 1242, 1245 (Pa. 1994)).
>
> Moreover, nothing in the logic of <u>Brady</u> materiality suggests a design to shield a defendant from his prior testimony or perjury. The test for <u>Brady</u> materiality is the same as the test for <u>Strickland</u> [<u>v. Washington</u>, 466 U.S. 668 (1984)] prejudice: whether there is a reasonable probability that the outcome of the proceeding would have been different. <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (U.S. 1995) (noting that <u>Bagley</u> adopted <u>Strickland</u> formulation for <u>Brady</u> claims). The test, whether for <u>Brady</u> or <u>Strickland</u>, looks to the proceeding that actually occurred and attempts to assess its underlying fairness. <u>See</u> <u>id.</u> at 451, 115 S.Ct. 1555; <u>see</u> <u>also</u> <u>Bagley</u>, 473 U.S. at 678, 105 S.Ct. 3375. The High Court has never held that courts, charged with assessing

Brady materiality by re-examining the trial that occurred in light of previously suppressed evidence, are obliged to diminish the record at that trial. Accordingly, appellant's theory is a non-starter. The expansion, if there is to be one, should come from the High Court.

Second and relatedly, this is a PCRA appeal. An assessment of the fairness of appellant's trial – whether he poses a Brady claim, a Strickland claim, or any other claim – is not measured by minority views in prior decisions or by hopeful predictions of where federal decisional law might someday go; it is measured by the existing law that governs. The only federal decisional law that governs in Pennsylvania is that commanded by the U.S. Supreme Court. … And, errors in such predictions [of where the law might develop] favoring the defense run the risk of arbitrarily releasing murderers.

*******************

Finally, I believe it is extremely unlikely that the U.S. Supreme Court would adopt a Brady materiality extension … which would immunize a defendant against the effects of his own trial testimony, much less his own false trial testimony. To borrow from the Strickland jurisprudence from which Brady materiality derives:

> It is true that while the Strickland test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims, there are situations in which the overriding focus on fundamental fairness may affect the analysis. Thus, on the one hand, as Strickland itself explained, there are a few situations in which prejudice may be presumed.... And, on the other hand, there are also situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate "prejudice." Even if a defendant's false testimony might have persuaded the jury to acquit him, it is not fundamentally unfair to conclude that he was not prejudiced by counsel's interference with his intended perjury. Nix v. Whiteside, 475 U.S. 157, 175-176, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

> Similarly, in [Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)], we concluded that, given the overriding interest in fundamental fairness, the likelihood of a different outcome attributable to an incorrect interpretation of the law should be regarded as a potential "windfall" to the defendant rather than the legitimate

"prejudice" contemplated by our opinion in Strickland…. Because the ineffectiveness of Fretwell's counsel had not deprived him of any substantive or procedural right to which the law entitled him, we held that his claim did not satisfy the "prejudice" component of the Strickland test.

Williams v. Taylor, 529 U.S. 362, 391-93, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citations and footnotes omitted). Cf. Commonwealth v. Cox, 581 Pa. 107, 863 A.2d 536, 556-57 (2004) (Castille, J., concurring) (strong argument to be made that heightened prejudice standard under Lockhart should be applied to ineffectiveness claims with "fundamental substantive issues that would have to be resolved in defendant's favor before relief could be granted"); United States v. Day, 285 F.3d 1167, 1171 (9th Cir. 2002) ("Because a defendant does not have a 'right' to commit perjury without suffering the consequences, the fact that counsel's ineffectiveness gave [defendant] an opportunity to commit perjury does not constitute deprivation of a right; accordingly, this portion of the sentence does not satisfy the prejudice component of Strickland."). Again, in explicating both Brady and Strickland, the High Court has stressed the overriding concern of whether the defendant has received a fair trial. Fairness works two ways, the High Court teaches. When the defendant takes the stand and elects to testify, and then testifies absurdly or untruthfully, I doubt that the U.S. Supreme Court would hold that Brady requires courts to pretend that his testimony never existed.

Weiss, 81 A.3d at 810-13 (Castille, C.J., concurring, joined by Eakin, J.) (footnotes omitted).

For these specific reasons, in addition to those set forth by the Majority on the time-bar and the merits, the new Brady claim fashioned by the PCRA court here provides no grounds for serial petition jurisdiction, much less PCRA relief.

**V. Conclusion**

The FCDO's agenda and tactics by now should be predictable: this group has been aptly described, by a federal judge, as "gaming a system and erecting roadblocks in aid of a singular goal -- keeping [the defendant] from being put to death." See Abdul Salaam v. Beard, 16 F. Supp. 3d 420, 511 (M.D. Pa. 2014). That gaming is bad

enough; but, what is disheartening here is that the PCRA court became unmoored from its lawful duty. Trial courts faced with serial petitions in capital cases must be vigilant to protect against frivolous claims, and must be aware of their own actual duties; the PCRA judge here was not.